**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MARLA A. SANTOS and
LAWRENCE E. SANTOS,

                Plaintiffs,                        CASE NO. 07-11229
                                                  HON. LAWRENCE P. ZATKOFF

v.

FARMERS INSURANCE EXCHANGE,
a foreign corporation, and ARRON PIETEILA
d/b/a Arron & Sarah Pietila Agency,

                Defendants.
_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on July 24, 2008

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This matter is before the Court on the following motions: (1) Defendant Arron Pietelia's

Motion for Summary Judgment [dkt. #48]; (2) Defendant Farmers Insurance Exchange's Second

Motion for Summary Judgment [dkt. #51]; and (3) Plaintiffs' Second Motion for Partial Summary

Judgment [dkt. #52]. All of the foregoing motions have been fully briefed and are supported by

extensive exhibits. The Court finds that the facts and legal arguments are adequately presented in

the parties' papers and the decision process would not be significantly aided by oral argument.

Therefore, pursuant to E.D. Mich. LR 7.1(e)(2), it is hereby ORDERED that the motions be resolved

on the briefs submitted. For the reasons set forth below, (1) Defendant Arron Pietelia's Motion for

Summary Judgment is GRANTED; (2) Defendant Farmers' Second Motion for Summary Judgment

is DENIED; and (3) Plaintiffs' Second Motion for Partial Summary Judgment is GRANTED in part and DENIED in part.

## II. BACKGROUND

The facts of this case have been set forth extensively in the Court's prior decisions in this matter and are recounted here only to the extent necessary to decide the present motions.

### A. Mrs. Santos's Accident and Plaintiffs' Initial Claim

This action arises out of an automobile accident on April 8, 2001, in which Plaintiff Marla Santos (Mrs. Santos) was seriously injured. At the time of the accident, Plaintiffs were insured by two insurance policies issued by Farmers. The primary policy provided for benefits required by Michigan's No-Fault Act, as well as additional underinsured motorist (UIM) benefits up to $500,000. The second policy (the umbrella policy) also provided for UIM benefits for damages exceeding the limits of the primary policy up to $1 million. Plaintiff Larry Santos (Mr. Santos) had been purchasing these policies for several years. Each year, Mr. Santos received an invoice and declarations page for both policies, reviewed the documents, paid his premiums, and filed the documents in his filing cabinet. However, Mr. Santos did not review the umbrella policy after his wife's accident, despite being aware of the policy, because he believed it did not apply to automobile accidents. Consequently, Mr. Santos did not provide the umbrella policy to his attorney, David Palmiere, and informed Mr. Palmiere that only the primary policy applied to Mrs. Santos's accident.

Shortly after the accident, Plaintiffs notified Farmers of the incident and of their intent to make a claim for insurance benefits. Upon learning that the at-fault driver's insurance would be inadequate to cover Mrs. Santos's injuries, Plaintiffs made a claim under their primary policy for UIM benefits. Plaintiffs did so through counsel, Mr. Palmiere, who wrote letters to Farmers in June

and July 2001, identifying the primary policy as the sole basis for the claim. In response to these letters, Steve Mrakitsch, one of Farmers' insurance adjusters, notified Mr. Palmiere that Plaintiffs were required to exhaust the at-fault driver's insurance benefits before they could pursue UIM benefits under the primary policy. Although Mr. Mraktisch acknowledged that Farmers' initial claims report indicated that Plaintiffs had an umbrella policy, that Plaintiffs claimed Mrs. Santos suffered grave and permanent injuries, and that he had no reason to disbelieve Plaintiffs' claims at the time, Mr. Mrakitsch did not believe that the umbrella policy's benefits would be necessary because Farmers had not received information showing Plaintiffs' claim to be in excess of the primary policy's limits.

Plaintiffs eventually settled with the at-fault driver for $25,000, which was the limit of his liability insurance coverage, and then re-pursued the UIM benefits under their primary policy. On December 31, 2001, Mr. Palmiere sent a letter to Mr. Mrakitsch indicating that the case had settled for the limits of the at-fault driver's policy and that Plaintiffs intended to claim UIM benefits under the primary policy. As before, Mr. Palmiere's letter specifically referenced the primary policy's number and relied on it as the sole basis for claiming UIM benefits. Furthermore, this letter demanded $475,000, which represented the limits of Plaintiffs' primary policy less the $25,000 settlement with the at-fault driver. Mr. Mrakitsch testified that he did not infer from this letter, or any other correspondence, that Plaintiffs and Mr. Palmiere were unaware of the UIM coverage in the umbrella policy. At this point, Mr. Mrakitsch began adjusting Plaintiffs' UIM claim using a computer program, known as Colossus, to estimate the claim's value.

**B.     Farmers' Handling of Plaintiffs' Claim**

In order to value the claim, Mr. Mrakitsch requested releases for Mrs. Santos's medical

records and medications, which he began receiving in February 2002.  He then input the information regarding Mrs. Santos's accident and injuries into the Colossus program and the program calculated a monetary value for the claim.  During the adjustment period, Plaintiffs, through counsel, continued to express their belief that the claim exceeded $475,000.  As of March 2002, based on the information in his possession, Mr. Mraktisch valued Plaintiffs' claim at $87,200 to $109,000.  Eventually, Mr. Mrakitsch received supplemental information from Plaintiffs, including up-to-date medical records, and, with the new information in Colossus, valued Plaintiffs' claim at $166,240 to $207,800.  Accordingly, on September 5, 2002, Mr. Mrakitsch transferred the claim to Corinne Hazen, an adjuster in Farmers' large-claims department.

Upon receiving Plaintiffs' claim from Mr. Mraktisch, Ms. Hazen reviewed the file and Plaintiffs' policies, including the umbrella policy.  After reviewing the file, Ms. Hazen was aware that Plaintiffs had demanded $475,000 but believed their claim to be worth more.   Ms. Hazen also stated, however, that attorneys routinely over-valued plaintiffs' claims. Ms. Hazen testified that all of Plaintiffs' correspondence referred specifically to the primary policy and its limits and that Mr. Palmiere never inquired as to whether additional policies or coverages were available.  As a result, Ms. Hazen did not believe that Plaintiffs intended to claim benefits under the umbrella policy and did not draw any conclusions as to whether Plainiffs or Mr. Palmiere were aware of the umbrella policy.[1]  Mr. Palmiere does not dispute that he never specifically inquired as to whether other policies applied, or that his written correspondence relied solely on the primary policy as the basis for Plaintiffs' claim, but testified that he asked Ms. Hazen if he was correct in his belief that

---

[1]Ms. Hazen testified that, in her experience, every attorney she has dealt with has asked whether an umbrella policy applies.

Plaintiffs' UIM claim was limited to $475,000. According to Mr. Palmiere, Ms. Hazen responded affirmatively. Additionally, in January 2003, Ms. Hazen interviewed Mrs. Santos at her home. During the interview, Mrs. Santos allegedly expressed her belief that the primary policy's limits were insufficient to compensate her for her injuries. Ms. Hazen does not recall this comment and further testified that she made no representations that Plaintiffs could not receive more than $475,000.

After evaluating the claims file and Mrs. Santos's medical records, Ms. Hazen determined that Plaintiffs' claim was far below $475,000; this valuation notwithstanding, Ms. Hazen acknowledged that it was possible that an arbitration panel could award more than she believed the claim was worth.[2] Furthermore, Ms. Hazen stated that, in her opinion, Plaintiffs never claimed benefits under the umbrella policy. According to Ms. Hazen, Plaintiffs' assertion that Mrs. Santos's injuries were grave and exceeded the limits of the underlying policy was not sufficient to claim benefits under the umbrella policy where Plaintiffs only referred to the primary policy and never referenced the umbrella policy and where her evaluation valued the claim well below the primary policy's limits. Based on these circumstances, Ms. Hazen did not mention the umbrella policy.

## C. The Parties' Arbitration and Settlement

Because the parties could not come to an agreement as to the amount of benefits Mrs. Santos was entitled to, Plaintiffs filed a complaint in Oakland County Circuit Court on February 14, 2002, seeking benefits under the primary policy. Plaintiffs amended their complaint on January 24, 2003, adding a claim to compel arbitration under the terms of the primary policy. While Mr. Palmiere

_____

[2]Mrs. Hazen testified that she continues to believe that Plaintiffs' claim is worth less than $475,000 and that, in her opinion, the arbitrators over-valued the claim.

corresponded with Farmers regarding the claims process, Mr. Santos, having become frustrated with Farmers' reluctance to pay the claim, contacted Defendant Arron Pietelia to seek assistance.

Mr. Pietelia had been Mr. Santos's insurance agent for many years and had issued both the primary policy and the umbrella policy. During the relevant conversation, Mr. Santos explained that he was frustrated with Farmers because he could not understand why Farmers was unwilling to arbitrate a claim that, to him, appeared minuscule in comparison to Mrs. Santos's suffering. Thus, Mr. Santos asked Mr. Pietelia to contact Farmers and, if possible, help move the arbitration along. Mr. Santos did not specify which policy he wanted to arbitrate or that the $475,000 limit would, in fact, be insufficient; nor did Mr. Santos specifically ask Mr. Pietelia if any other coverage was available. Furthermore, Mr. Santos did not provide any information to Mr. Pietelia that would indicate that $475,000 was not sufficient to cover Mrs. Santos's injuries and expenses. In response, Mr. Pietelia agreed to contact Farmers but did not make any representations regarding the availability of insurance coverage. After contacting Farmers, Mr. Pietelia informed Mr. Santos that he would be unable to speed up the arbitration process.

Eventually, the parties agreed to arbitrate the issue of damages under the primary policy and, additionally, chose to inform the arbitrators that the limit of the primary policy was $475,000. During this proceeding, Farmers contended that Plaintiffs were entitled to make a claim under the primary policy for $475,000. In contrast, Plaintiffs provided calculations that valued their claim between $660,000 and $810,000. According to Mr. Palmiere, these estimates were intentionally conservative. On August 20, 2003, the arbitrators awarded $475,000 to Plaintiffs. Farmers then attempted to set aside the arbitration award but on March 12, 2004, the state court entered a $475,000 judgment against Farmers, which Farmers paid in full. Plaintiffs executed a satisfaction

of the arbitration award and released Farmers from all UIM claims under the primary policy.

**D.     Plaintiffs' Realization that the Umbrella Policy Provided Coverage**

Three years after completing the arbitration with Farmers, Plaintiffs raised the issue of coverage under the umbrella policy with Mr. Palmiere.  The umbrella policy is, by and large, a liability policy that provides excess insurance for liabilities that are insured by other specified policies.  In addition, the umbrella policy contains an endorsement that adds UIM benefits.  The endorsement provides that "[f]or the additional premium paid, it is agreed that this policy will provide Uninsured and/or Underinsured Motorist Coverage(s) to you or any other insured under this policy, to the extent that either or both coverages are a part of the underlying insurance, except for our limit of liability."  Thus, the scope of the umbrella policy's UIM coverage is identical to the coverage in the primary policy, and it provides benefits for losses exceeding $500,000.

Plaintiffs now claim that had they pursued benefits under the separate umbrella policy, the arbitration panel would have awarded Mrs. Santos $1,475,000 in benefits.  In Count 1 of the current complaint, Plaintiffs allege that Farmers breached the terms of the umbrella policy by not paying UIM benefits under that policy.  In Count 2, Plaintiffs claim that Farmers and Mr. Pietelia committed misrepresentations by failing to disclose the existence of the umbrella policy and representing that Plaintiffs' benefits were limited to $475,000.

## III.  LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Turner v. City of Taylor*, 412 F.3d 629, 637 (6th Cir. 2005).  When deciding a

motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* at 249 (citations omitted). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. These same rules of review apply where the parties have filed cross-motions for summary judgment. *Westfield Ins. Co. v. Tech Dry Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

## IV. ANALYSIS

### A. Defendant Arron Pietelia's Motion for Summary Judgment

Defendant Pietelia argues that he is entitled to summary judgment as to Count 2 of Plaintiffs' complaint, which asserts a claim of misrepresentation, because he did not have a duty to disclose the existence of the umbrella policy to Mr. Santos. Specifically, Mr. Pietelia states that under Michigan law, insurance agents such as himself owe no duty to advise insureds as to the adequacy and/or availability of insurance coverage unless certain, narrow exceptions apply. Accordingly, he argues that none of the exceptions apply in this case and he cannot be held responsible for failing to disclose the existence of the umbrella policy to Mr. Santos. In contrast, Plaintiffs argue that all of the narrow exceptions apply to this case and that Mr. Pietelia misled Mr. Santos when he failed

to disclose the umbrella policy. Notwithstanding the presence or absence of a duty to disclose, the Court finds that Plaintiffs' claim against Mr. Pietelia must fail because they have not produced any evidence that he made a material misrepresentation.

In order to prevail on a misrepresentation claim, Plaintiffs must generally demonstrate that (1) Mr. Pietelia made a representation concerning a material fact; (2) the representation was false; (3) Mr. Pietelia, at the time of the representation, knew the representation was false or made it with a reckless disregard for its truth; (4) Mr. Pietelia intended for Plaintiffs to act on the representation; (5) Plaintiffs acted in reliance on the representation; and (6) Plaintiffs suffered damages as a result. *Bergen v. Baker*, 691 N.W.2d 770, 774 (Mich. Ct. App. 2004) (quoting *M & D Corp. v. W.B. McConkey*, 585 N.W.2d 33, 36 (Mich. Ct. App. 1998)). In addition, because Plaintiffs' claim is premised on the theory of silent fraud, they must show that Mr. Pietelia suppressed a material fact under circumstances where he had a legal or equitable duty to disclose that fact. *Id.* Finally, "there must be some type of misrepresentation, whether by words or action, in order to establish a claim of silent fraud." *M & D Corp.*, 585 N.W.2d at 41.

The Court finds that Plaintiffs have not provided any evidence that Mr. Pietelia made a representation about the existence of the umbrella policy or the amount of Plaintiffs' insurance coverage. A representation is made when a person's conduct or action is sufficient to create in the mind of another a distinct impression of fact conducive to the latter's action. *See Groening v. Opsata*, 34 N.W.2d 560, 564 (Mich. 1948). Plaintiffs admit that Mr. Pietelia did not make any affirmative representations regarding the existence of the umbrella policy. That is, Mr. Pietelia did not tell Plaintiffs that their recovery was limited to $475,000 or that they had no other applicable insurance policies. Rather, Plaintiffs claim that Mr. Pietelia's failure to disclose the umbrella policy

in light of Mr. Santos's general statements regarding Farmers' refusal to arbitrate their claim created the false impression that the umbrella policy did exist. This argument is not supported by the record.

Other than the allegations in their complaint and the arguments accompanying their response to Mr. Pietelia's motion, there is no evidence in the record that Mr. Pietelia made any representations as to the availability or existence of insurance coverage. The record shows that Mr. Santos was frustrated because he could not understand why Farmers was unwilling to arbitrate a claim that, to him, appeared minuscule in comparison to Mrs. Santos's suffering. As a result of this frustration, Mr. Santos contacted Mr. Pietelia, explained that he was frustrated, and asked Mr. Pietelia to help move the arbitration along. Mr. Santos did not say that the $475,000 limit would, in fact, be insufficient, nor did he specifically ask Mr. Pietelia if any other coverage was available. Furthermore, Mr. Santos did not provide any information to Mr. Pietelia that would indicate that $475,000 was not sufficient to cover Mrs. Santos's injuries and expenses. Mr. Pietelia agreed to look into the situation with Farmers and later informed Mr. Santos that there was nothing he could do to move the arbitration along because it was "between the lawyers." Mr. Pietelia at no point in these conversations with Mr. Santos represented that the umbrella policy was inapplicable or did not exist, or that Plaintiffs' recovery was limited to $475,000.

In context, the conversations Mr. Santos had with Mr. Pietelia had nothing to do with available insurance coverage. Instead, they concerned the means of obtaining specific insurance benefits. Mr. Pietelia correctly points out that Mr. Santos's complaint that $475,000 was insignificant compared to the suffering his wife had gone through was not a request for Mr. Pietelia to find additional coverage, but was merely meant to emphasize his frustration with Farmers for not cooperating. At most, then, Mr. Pietelia represented that he would try to assist Mr. Santos with

getting Farmers to arbitrate.[3]  The mere fact that Mr. Santos mentioned the limit of his underlying

policy did not turn Mr. Pietelia's representation about arbitration into a representation that no other

insurance policies were applicable or that only $475,000 was available.  Moreover, there was

nothing in the conversations between Mr. Santos and Mr. Pietelia to indicate to Mr. Pietelia that Mr.

Santos was unaware of the existence the umbrella policy.  In short, neither Mr. Pietelia's words nor

his actions under these circumstances created any impression, false or otherwise, regarding the

existence of additional insurance coverage.  Accordingly, Plaintiffs' evidence in response to Mr.

Pietelia's motion is insufficient to show a genuine issue of fact for trial.[4]

## B.    Farmers' Second Motion for Summary Judgment

Farmers argues that it is entitled to summary judgment on Plaintiffs' breach of contract claim

because Michigan does not recognize a cause of action for a breach of the implied covenant of good

faith and fair dealing.  As to Plaintiffs' misrepresentation claim, Farmers argues that Plaintiffs could

not have reasonably relied on any representations Farmers made regarding the existence of the

umbrella policy because Plaintiffs had the means to determine that any false representation was not

true.  The Court will address each of these arguments separately.

---

[3]Mr. Pietelia's statement that the arbitration issue was "between the lawyers" cannot form
the basis of a misrepresentation claim as it appears to be nothing more than an opinion.  *See
Johnson v. Botsford Gen. Hosp.*, 748 N.W.2d 907, 912 n.12 (Mich. Ct. App. 2008).  Further, Mr.
Pietelia's ability to help Mr. Santos initiate arbitration is not material to Plaintiffs' claim that Mr.
Pietelia misrepresented the amount of coverage available, and there is otherwise no evidence that
Plaintiffs detrimentally relied on Mr. Pietelia's statement that he was unable to help.

[4]Though the Court need not reach the issue of whether Plaintiffs' claim against Mr.
Pietelia is barred by the statute of limitations, the Court finds it interesting that in opposing Mr.
Pietelia's argument, Plaintiffs essentially concede that they have not suffered any damages as a
result of any misrepresentation Mr. Pietelia may have made.  As damages are an essential
element of Plaintiffs' misrepresentation claim, this concession would serve as an independent
basis for granting summary judgment in Mr. Pietelia's favor.

1.      *Plaintiffs' Breach of Contract Claim*

Farmers argues that it is entitled to summary judgment on Plaintiffs' breach of contract claim because Michigan does not recognize a cause of action for a breach of the implied covenant of good faith and fair dealing.  In support of this claim, Farmers cites *Kewin v. Massachusetts Mut. Life Ins. Co.*, 295 N.W.2d 50 (Mich. 1980).  The *Kewin* court, however, did not hold that a breach of the covenant of good faith and fair dealing could not give rise to a cause of action for breach of contract; instead, the court merely declined to recognize a separate cause of action in tort based on the bad faith breach of an insurance contract. *See id.* at 56.  Indeed, Michigan courts have recognized the existence of an implied covenant of good faith and fair dealing, *see Wakefield v. Globe Indem. Co.*, 225 N.W. 643 (Mich. 1929), specifically "where a party to a contract makes the manner of its performance a matter of its own discretion," *Burkhardt v. City Nat. Bank of Detroit*, 226 N.W.2d 678, 680 (Mich. 1975). *See, e.g. Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 36 (1995) ("[T]he covenant [of good faith and fair dealing] is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement.").  Contracts for insurance are no different, and also contain an implied covenant of good faith and fair dealing between the insurer and the insured. *See Quarters v. Mich. Physicians Mut. Liab. Co.*, 399 N.W.2d 46, 48 (Mich. 1986) ("The obligation of an insurer to protect in good faith its insured arises out of the contract."); *Comm. Union Ins. Co. v. Med. Protective Co.*, 393 N.W.2d 479, 482 (Mich. 1986); *Murphy v. Cincinnati Ins. Co.*, 576 F. Supp. 542, 544 (E.D. Mich. 1983), *aff'd,* 772 F.2d 273 (6th Cir. 1985); *Dahlke v. Home Owners Ins. Co.*, No. 239120, 2003 WL 23018291, at *4 (Mich. Ct. App. Dec. 23, 2003). *See also Schwartz v. State Farm Fire & Cas. Co.*, 88 Cal. App. 4th 1329, 1337-37 (2001) ("The implied duty not to

impair the insured's right to benefits arises from the contractual relationship existing between the parties, and indeed is unconditional and independent of the performance of the insured's contractual obligations."). Accordingly, the Court finds Farmers' broad reading of *Kewin* unpersuasive.

The duty of good faith has been defined as "honesty in fact and the observance of commercially reasonably standards of fair dealing." 14 Steven Plitt et al., *Couch on Insurance* § 198:5 (3d ed. 1995). In the context of insurance contracts, the implied covenant of good faith and fair dealing necessarily precludes obstructing the insured's rights under the contract, which is a breach of the contract itself. *See id.*; 23 Eric Mills Holmes & John Alan Appleman, *Appleman on Insurance Law and Practice* § 145.5 (2d ed. 2003) ("The implied duty of good faith and fair dealing essentially requires that neither party to a contract do anything to impair or injure the other's right to receive the benefits of the agreement. An insurer that breaches its duty of good faith and fair dealing to its insured breaches the contract ...."). Where the mechanisms by which a claim is processed and valued are within the discretion of the insurer, the insurer must exercise that discretion honestly and in good faith. *See Burkhardt*, 226 N.W.2d at 680; *see also* 14 *Couch on Insurance* § 198:1. An insurer should also consider the insured's interest as well as its own. 14 *Couch on Insurance* § 198:5. Similarly, the insurer, which is in a vastly superior position that the insured when it comes to the claims handling process, cannot take advantage of its insured's ignorance of his contractual rights. *See Burgess v. Am. Fid. Fire Ins. Co.*, 310 N.W.2d 23, 25 (Mich. 1981) ("The insurance carrier will not be permitted to benefit by sitting idly by," knowing of its insured's rights, "and watch its insured become prejudiced."); *see also Weber v. State Farm Mut. Auto. Ins. Co.*, 873 F. Supp. 201, 205 (S.D. Iowa 1994) (finding the implied covenant of good faith and fair dealing obligated the insurer to disclose UIM coverage where the existence of coverage was

not clear on the face of the policy and the insurer knew that the insured's attorney was unaware or did not understand such coverage); *MFA Mut. Ins. Co. v. Flint*, 574 S.W.2d 718 (Tenn. 1978) (concluding that the insurer should not knowingly take advantage of the insured's ignorance as to the extent of coverage afforded in obtaining a release from the insured); 1 Allan D. Windt, *Insurance Claims and Disputes* § 2:2 (4th ed. 2007) ("[A]n insurer cannot attempt to exploit the insured's ignorance of his rights."). Taking the record in the light most favorable to Plaintiffs, the Court finds that genuine issues of fact exist as to whether Farmers breached the implied covenant of good faith and fair dealing in the umbrella policy.

The record shows that Plaintiffs believed their claim exceeded the limits of the primary policy's benefits and expressed this belief to Farmers. Mr. Santos stated several times that he believed his wife's injuries were worth far more than $475,000. Similarly, during her interview with Ms. Hazen, Mrs. Santos expressed her view that based on her injuries and pain and suffering, $475,000 was not nearly adequate compensation. Finally, in a letter to Farmers in August 2002, Mr. Palmiere stated that "[w]e believe that it is clear, from the enclosed records, and those of Botsford Hospital, previously sent to you, that Mrs. Santos sustained an injury worth well in excess of your policy limits of $500,000 ...." It would thus be reasonable for a jury to conclude that Plaintiffs believed their claim exceeded the primary policy's limits.

The record also shows that Plaintiffs were unaware that their umbrella policy provided UIM benefits covering Mrs. Santos's accident. Regardless of the legal presumption that an insured knows the contents of an insurance policy, the facts of this case, when viewed in Plaintiffs' favor, indicate otherwise. Immediately after the accident, Mr. Santos reviewed the insurance policies that he believed would apply to his wife's accident. Despite knowing that the umbrella policy existed, Mr.

Santos believed that it was irrelevant to his wife's situation since it was primarily a liability policy. From this point on, Plaintiffs' correspondence with Farmers referred only to their primary policy and the limits of that policy. In one letter, Mr. Palmiere stated, "As we understand your UIM limits to be $500,000, and that you are entitled to a credit for State Farm's settlement, our demand at this point is for payment of $475,000." A jury could infer from these facts, in conjunction with Plaintiffs' belief that their claim exceeded $475000, that Plaintiffs did not know about the UIM coverage in the umbrella policy.

The record shows that Farmers knew or should have known that Plaintiffs were unaware that their umbrella policy applied to this case. It is undisputed that Farmers' adjusters involved with Plaintiffs claim knew at all times that Plaintiffs had an umbrella policy. Farmers' adjusters, having reviewed all the correspondence from Plaintiffs' counsel, also knew that Plaintiffs believed their claim exceeded the limits of the primary policy. In addition, all of Plaintiffs' letters to Farmers identified their primary policy only and referred to Plaintiffs' policies in the singular; Mr. Palmiere never referred to any other policy. According to Ms. Hazen, however, it was the ordinary practice for attorneys to inquire about benefits under umbrella or excess policies. At the very least, then, Ms. Hazen should have been alerted to the possibility that Plaintiffs' did not know the extent of available UIM coverage or misunderstood such coverage. Moreover, both Mr. Mrakitsch and Ms. Hazen were aware of the facts indicating that Plaintiffs were unaware of the UIM benefits in the umbrella policy. Based on these circumstances, a reasonable jury could conclude that Farmers knew or should have known that Plaintiffs were ignorant of the UIM benefits in the umbrella policy.

The record shows that Farmers knew that Plaintiffs claim could invade the umbrella policy's benefits. Both of Farmers' adjusters in this case reviewed Plaintiffs' claim file and used the

Colossus program to place a value on Plaintiffs' claim. Both adjusters valued the claim at far less than the primary policy's limits. Nevertheless, both adjusters acknowledged that the arbitrators' award could exceed their valuation and reach the primary policy's limits. Thus, despite their belief as to the value of Plaintiffs' claim, both adjusters knew that it was possible that Plaintiffs' claim could implicate the umbrella policy. Indeed, this possibility became a reality after the arbitrators awarded Plaintiffs $475,000. Rather than immediately complying with this award, Farmers sought to have it set aside. More importantly, Farmers never disclosed the existence of UIM coverage in the umbrella policy. Therefore, a jury could reasonably infer that Farmers was aware that the umbrella policy may be applicable to Plaintiffs' claim.

A jury could infer that by failing to disclose the existence of the umbrella policy–particularly after the arbitrators awarded Plaintiffs the limits of the primary policy and Farmers failed in its attempt to reduce the award to less than the policy limits–Farmers attempted to take advantage of Plaintiffs' lack of knowledge, amounting to a breach of the covenant of good faith and fair dealing. A jury could also infer that Farmers inhibited Plaintiffs' access to the benefits available under the umbrella policy by consistently maintaining that Plaintiffs were only entitled to $475,000 and challenging the arbitrators' award even though Farmers was long aware that Plaintiffs claim could reach the umbrella policy and circumstances showed that Plaintiffs did not realize they could receive additional benefits. Accordingly, Farmers' motion must be denied.

The Court rejects Farmers' argument that res judicata bars Plaintiffs' claim. In Michigan, "[a] second action is barred when (1) the first action was decided on the merits, (2) the matter contested in the second action was or could have been resolved in the first, and (3) both actions involve the same parties or their privies." *Sewell v. Clean Cut Mgmt.*, 621 N.W.2d 222, 225 (Mich.

2001) (quoting *Dart v. Dart*, 597 N.W.2d 82, 88 (Mich. 1999)).  Notwithstanding the Court's prior

discussion of this issue, which occurred before discovery commenced and involved little meaningful

argument from the parties, the Court finds that Plaintiffs could not have brought a claim for breach

of the umbrella policy as part of their action in state court.  This is because Plaintiffs had no right

to receive the benefits of the umbrella policy until the limits of the underlying policy had been

exhausted.  Therefore, the requirements of res judicata do not exist in this case.

Finally, the Court finds that Plaintiffs' cause of action is not barred by collateral estoppel.

For collateral estoppel, or issue preclusion, to apply, the issue sought to be precluded must involve

a "question of fact essential to the [prior] judgment ..." *Monat v. State Farm Ins. Co.*, 677 N.W.2d

843, 845 (Mich. 2004).  Again, the Court's earlier discussion concerning this issue occurred prior

to discovery and on an incomplete record.  Now that the parties have completed discovery, however,

it is clear that the issue of damages was not litigated as part of the arbitration beyond the limits of

the primary policy.  Stated differently, the arbitrators did not necessarily award $475,000 because

they believed that was all Plaintiffs' claim was worth, but because the parties framed their arguments

around the limits of the primary policy.  Thus, whether Plaintiffs' damages exceeded $475,000 was

not necessarily a question of fact essential to the arbitrators' award and final judgment.

Accordingly, collateral estoppel does not apply.

2.      *Plaintiffs' Misrepresentation Claim*

Farmers contends that it is entitled to summary judgment on Plaintiffs' misrepresentation

claim because Plaintiffs possessed the umbrella policy at all relevant times and were charged with

knowledge of its terms.  Therefore, Farmers maintains that Plaintiffs could not have reasonably

relied on any representations Farmers may have made regarding the existence of the umbrella policy

or its coverage. In order to prevail on a misrepresentation claim, Plaintiffs must generally demonstrate that (1) the defendant made a representation concerning a material fact; (2) the representation was false; (3) the defendant, at the time of the representation, knew the representation was false or made it with a reckless disregard for its truth; (4) the defendant intended for Plaintiffs to act on the representation; (5) Plaintiffs acted in reliance on the representation; and (6) Plaintiffs suffered damages as a result. *Bergen*, 691 N.W.2d at 774.

Although Farmers is correct that ordinarily an insured is charged with knowledge of the terms of his policy, *see Casey v. Auto Owners Ins. Co.*, 729 N.W.2d 277, 283 (Mich. Ct. App. 2006), and that a person cannot establish reasonable reliance on a misrepresentation where the person possesses the means with which to assess the accuracy of that representation, *see Nieves v. Bell Indus. Inc.*, 517 N.W.2d 235, 238 (Mich. Ct. App. 1994), Farmers ignores evidence that its agents made representations regarding the umbrella policy at a time when it was apparent that Plaintiffs were unaware that the umbrella policy provided coverage for Mrs. Santos's accident. The general rules Farmers cites are qualified by the absence of fraud. *See Rory v. Continental Ins. Co.*, 703 N.W.2d 23, 42 n.82 (Mich. 2005) ("This Court has historically held an insured to have knowledge of the contents of the policy, *in the absence of fraud*, even though the insured did not read it."); *Schuler v. Am. Motors Sales Corp.*, 197 N.W.2d 493, 495 (Mich. Ct. App. 1972) ("There is no fraud where means of knowledge are open to the plaintiff *and the degree of their utilization is circumscribed in no respect by defendant*."). Consequently, Farmers cannot stand on the fact that Plaintiffs possessed the means of knowledge to determine the accuracy of Farmers' representations where Farmers acted in such a way to dissuade Plaintiffs from making the inquiry in the first place.

Similarly, Farmers cannot rely on Plaintiffs' presumed knowledge where the record shows that Farmers knew or should have known Plaintiffs in fact did not know the terms of the policy.

The record, when viewed in the light most favorable to Plaintiffs, shows that after Farmers knew or should have known that Plaintiffs were ignorant of the UIM benefits in the umbrella policy, Mr. Palmiere inquired over the telephone with respect to the amount of available UIM coverage Plaintiffs carried with Farmers. In response to these inquiries, Ms. Hazen told Mr. Palmiere that Plaintiffs could not recover more than $475,000 in UIM benefits. Unlike the written correspondence between Mr. Palmiere and Farmers, there is no indication that his verbal inquiries were in any way limited to the primary policy's benefits. Therefore, in light of the facts pertaining to Farmers' knowledge discussed above, a reasonable jury could infer that Farmers committed an actionable misrepresentation when Ms. Hazen, knowing that the umbrella policy could apply and that Plaintiffs were ignorant of its applicability, responded to Mr. Palmiere's questions by stating that Plaintiffs were only entitled to $475,000 in UIM benefits. Such a statement, under these circumstances, could have created the impression that no other UIM benefits were available under any policy, which could have dissuaded Plaintiffs from investigating other policies. Accordingly, Farmers is not entitled to summary judgment on Plaintiffs' misrepresentation claim.

## C.    Plaintiffs' Second Motion for Partial Summary Judgment

In their Second Motion for Partial Summary Judgment, Plaintiffs argue that there is no issue of material fact that Farmers breached the umbrella policy by failing to pay UIM benefits after the arbitrators awarded the policy limits of the primary policy. Plaintiffs further maintain that Farmers' affirmative defenses are not viable.

The basis for Plaintiffs' motion is the Court's Opinion and Order dated February 22, 2008, in which the Court found that Plaintiffs complied with the umbrella policy's notice requirements. As such, Plaintiffs argue that Farmers was obligated to pay them any benefits that exceeded the limits of the primary policy. However, Plaintiffs' reading of the Court's Opinion is overly broad. The Court's discussion of the notice requirement concerned Farmers' argument that Plaintiffs could not establish a breach of the umbrella policy because they failed to provide Farmers with notice in compliance with the umbrella policy's terms. The umbrella policy required Plaintiffs to provide certain information to Farmers "if an occurrence is likely to involve coverage." In the February 22 Opinion, the Court rejected Farmers' argument that Plaintiffs were required to specifically inform Farmers that coverage under the umbrella policy was likely, and found that Plaintiffs had substantially complied with the notice requirement. This determination, however, does not compel the Court to conclude that Farmers breached the umbrella policy by failing to pay benefits.

It is well-established that one who seeks performance of a contractual obligation must prove that all conditions precedent have been satisfied. *Koski v. All State Ins. Co.*, 572 N.W.2d 636, 639 (Mich. 1998). As Farmers correctly notes, a condition precedent to its obligation to pay benefits under the umbrella policy was that Plaintiffs' damages "exceed the total applicable underlying insurance." Although Plaintiffs exhausted the limits of their underlying policy, they have not produced sufficient evidence in this case to show that their damages *exceeded* $475,000. As such, summary judgment for Plaintiffs is inappropriate. This result should not be construed as a determination that Plaintiffs cannot establish a breach of the umbrella policy. As explained above, factual issues exist as to whether Farmers acted in bad faith by concealing the umbrella policy's existence from Plaintiffs; accordingly, a jury could find that the failure of the condition precedent

was caused by Farmers, which is a breach of the umbrella policy. *See Stark v. Budwarker, Inc.*, 181 N.W.2d 298, 301 (Mich. Ct. App. 1970); 13 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 39:12 (4th ed. 2000) ("Prevention of performance is a material breach of contract .... Where performance of a condition precedent to a promisor's liability has been prevented by the promisor, an action for damages may be maintained by the promisee without performance.").

Plaintiffs also move for summary judgment with respect to all of Farmers' "affirmative defenses." Res judicata and collateral estoppel were discussed above with respect to Farmers' motion and it is sufficient to say that neither of these defenses apply in this case. Similarly, the Court's previous summary judgment rulings implicitly reject Farmers' first and second "affirmative defenses" (*i.e.*, that Plaintiffs have failed to state a claim upon which relief can be granted); consequently, this argument is moot and no further action is necessary. *See United States v. Conagra, Inc.*, No. 96-0134, 1997 WL 33545777, at *16 (D. Idaho Dec. 31, 1997).

Farmers' statute of limitations defense is also unpersuasive. The limitations period in actions for breach of contract is six years. Mich. Comp. Laws § 600.5807(8). Furthermore, the Court is not persuaded that Plaintiffs' misrepresentation claim falls within the three-year "catch all" statute of limitations in Mich. Comp. Laws § 600.5805(10), as Farmers suggests, as opposed to the six-year statute of limitations in Mich. Comp. Laws § 600.5813. *See Kuebler v. Equitable Life Assur. Soc. of the U.S.*, 555 N.W.2d 496, 499 (Mich. Ct. App. 1996). Mrs. Santos's accident occurred on April 8, 2001, and Plaintiffs commenced the current action on March 21, 2007. Since any claim for a breach of the umbrella policy or misrepresentation could not have accrued earlier than April 8, 2001, and Plaintiffs filed their complaint within six years of that date, their claims are timely.

The remainder of Farmers' "affirmative defenses" are either denials of Plaintiffs' allegations and, thus, not affirmative defenses or depend on the questions of fact discussed above, which precludes a finding that the defenses do not apply as a matter of law. Accordingly, the Court finds that res judicata, collateral estoppel, and the statute of limitations do not bar Plaintiffs' action.

## V. CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Defendant Pietelia's Motion for Summary Judgment is GRANTED, Defendant Farmers' Second Motion for Summary Judgment is DENIED, and Plaintiffs' Second Motion for Partial Summary Judgment is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that Plaintiffs' claims against Defendant Pietelia are DISMISSED.

IT IS FURTHER ORDERED that all counsel and parties (or a party representative with authorization to settle this case) remaining in this case shall appear on August 5, 2008, at 11:00 a.m. for the Final Pretrial Conference. Counsel shall refer to the Court's Scheduling Order previously issued and comply with all requirements for the Final Pretrial Conference, including, without limitation, production of a Joint Final Pre-Trial Order and jury instructions.

IT IS SO ORDERED.

S/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated: July 24, 2008

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on July 24, 2008.

S/Marie E. Verlinde
Case Manager
(810) 984-3290